# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA,
## ATLANTA DIVISION

| | |
|---|---|
| STEPHEN BUSHANSKY, on Behalf of Himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>TRAVELPORT WORLDWIDE LIMITED, GORDON WILSON, DOUGLAS STEENLAND, ELIZABETH BUSE, STEVEN CHAMBERS, MICHAEL DURHAM, SCOTT FORBES, DOUGLAS HACKER, and JOHN SMITH,<br><br>Defendants. | Civil Action No.<br><br><u>CLASS ACTION</u><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Stephen Bushansky ("Plaintiff"), by and through his undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE AND SUMMARY OF THE ACTION

1.    This is a stockholder class action brought by Plaintiff on behalf of himself and all other public stockholders of Travelport Worldwide Limited ("Travelport" or the "Company") against Travelport and the members of

Travelport's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and to enjoin the vote on a proposed transaction, pursuant to which Travelport will be acquired by affiliates of Siris Capital Group, LLC ("Siris") and Evergreen Coast Capital Corp. ("Evergreen"), the private equity affiliate of Elliott Management Corporation ("Elliott Management," and together with Evergreen, "Elliott") (the "Proposed Transaction").

2.     On December 10, 2018, Travelport issued a press release announcing it had entered into an Agreement and Plan of Merger dated December 9, 2018 to sell Travelport to Elliot and Siris.  Under the terms of the Merger Agreement, each Travelport stockholder will receive $15.75 in cash for each share of Travelport common stock they own (the "Merger Consideration").  The Proposed Transaction is valued at approximately $4.4 billion.

3.     On February 13, 2019, Travelport filed a Definitive Proxy Statement on Schedule 14A (the "Proxy Statement") with the SEC.  The Proxy Statement, which recommends that Travelport stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other

things: (i) the Company's financial projections, relied upon by the Company's financial advisor Morgan Stanley & Co. LLC ("Morgan Stanley") in its financial analyses; (ii) the valuation analyses prepared by Morgan Stanley in connection with the rendering of its fairness opinion; (iii) Morgan Stanley's and Travelport insiders' potential conflicts of interest; and (iv) the background process leading to the Proposed Transaction.  The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act as Travelport stockholders need such information in order to make a fully informed decision whether to vote in favor of the Proposed Transaction or seek appraisal.

4.    In short, unless remedied, Travelport's public stockholders will be forced to make a voting or appraisal decision on the Proposed Transaction without full disclosure of all material information concerning the Proposed Transaction being provided to them.  Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6.     This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391 because: (i) the Company's U.S. headquarters are located in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

8.     Plaintiff is, and has been at all times relevant hereto, a continuous stockholder of Travelport.

9.     Defendant Travelport is a Bermuda exempt company, with its principal executive offices located at Axis One, Axis Park Langley, Berkshire, SL3 8AG, United Kingdom.   Travelport's U.S. headquarters are located at 300 Galleria Parkway, Atlanta, Georgia 30339.   The Company operates a travel commerce platform that offers distribution, technology, payment, and other solutions for the

travel and tourism industry. Travelport's common stock trades on the New York Stock Exchange under the ticker symbol "TVPT."

10.    Defendant Gordon Wilson ("Wilson") has been Chief Executive Officer ("CEO"), President and a director of the Company since June 2011. Defendant Wilson has also been chairman of the board of directors of eNett International (Jersey) Limited ("eNett"), Travelport's majority-owned subsidiary, since April 2016. Defendant Wilson previously served as Travelport's Deputy CEO from November 2009 until June 2011 and as President and CEO of Travelport's Global Distribution System business beginning in January 2007.

11.    Defendant Douglas Steenland ("Steenland") has been a director of the Company since its initial public offering ("IPO") in September 2014 and Chairman of the Board since May 2013.

12.    Defendant Elizabeth Buse ("Buse") has been a director of the Company since its IPO in September 2014.

13.    Defendant Steven Chambers ("Chambers") has been a director of the Company since April 2015.

14.    Defendant Michael Durham ("Durham") has been a director of the Company since its IPO in September 2014.

15.    Defendant Scott Forbes ("Forbes") has been a director of the Company since July 2016.

16.    Defendant Douglas Hacker ("Hacker") has been a director of the Company since its IPO in September 2014.

17.    Defendant John Smith ("Smith") has been a director of the Company since March 2017.

18.    Defendants identified in paragraphs 10-17 are referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT ENTITIES

19.    Elliott Management serves as the investment advisor to two multi-strategy investment funds, Elliott Associates, L.P. and Elliott International, L.P. (together, the "Elliott Funds").  The Elliott Funds combined have approximately $35 billion in assets under management.  In connection with the Proposed Transaction, the Elliott Funds granted equity commitments to Parent (defined below).

20.    Evergreen is Elliott Management's private equity affiliate.

21.    Siris is a private equity firm headquartered in New York, New York. In connection with the Proposed Transaction, funds affiliated with Siris, Siris Partners IV (Cayman) Main, L.P. and Siris Partners IV (Cayman) Parallel, L.P. (together, "Siris Cayman Fund IV"), granted equity commitments to Parent.

22.    Toro Private Holdings III, Ltd. ("Parent") is an affiliate of Siris Cayman Fund IV and a party to the Merger Agreement.

23.    Toro Private Holdings IV, Ltd. ("Merger Sub") is a wholly owned direct subsidiary of Parent, an affiliate of Siris Cayman Fund IV and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

24.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Travelport common stock (the "Class").  Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

25.    Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

26.    The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of February 4, 2019, there were 126,509,212 shares of Company common stock issued and outstanding.  All members of the Class may be identified from records maintained by Travelport or its transfer agent and may be

notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

27.    Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

a)    Whether defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

b)    Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

c)    Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

28.    Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.  Plaintiff has retained competent counsel experienced in litigation of this nature.

29.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

30.    Defendants have acted on grounds generally applicable to the Class

with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

31.    Incorporated in 2006, Travelport operates a travel commerce platform which offers distribution, technology, payment, mobile, and other solutions for the travel and tourism industry.

32.    Through its Travel Commerce Platform, comprised of Air and Beyond Air segments, Travelport connects travel providers, such as airlines and hotel chains, with online and offline travel agencies and other travel buyers.  Travelport also provides a range of digital and mobile services that allow airlines, hotels, corporate travel management companies and travel agencies to engage with their customers through mobile services, including applications, corporate booking tools, mobile Web and mobile messaging.  The Company provides air distribution services to approximately 480 airlines globally, including over 120 low cost carriers, and distributes ancillaries for over 80 airlines.  Travelport also secures content from numerous Beyond Air travel providers, including approximately 650,000 hotel properties (of which over 500,000 are independent hotel properties), over 40,000 car rental locations, approximately 40 cruise-line and tour operators and 20 major rail

networks worldwide. Travelport processed approximately $89 billion in travel spending in 2018.

33.    Travelport is also the majority owner of eNett, a payment services company. eNett's core offering is a payment solution that automatically generates unique Mastercard numbers, eNett Virtual Account Numbers ("VANs"), used to process payments globally. eNett is known for partnering with well-known travel agencies on a global scale to facilitate faster, easier and safer payments to their suppliers.

34.    On May 3, 2018, the Company issued a press release announcing its first quarter of 2018 financial results, including net revenue of $678 million, compared to $651 million for the first quarter of 2017. The Company also reported net income of $59 million, compared to $56 million in the first quarter of 2017. Defendant Wilson commented on the successful quarter, stating:

> **Travelport has delivered a strong start to the year with 5% Travel Commerce Platform revenue growth and Adjusted EBITDA ahead of our expectations.** These results include the well-documented loss of one large travel agency in the Pacific region, which impacted Travel Commerce Platform revenue growth by 5 percentage points and Adjusted EBITDA by 9 percentage points. **Our performance, therefore, demonstrates the continued success of our strategy, resulting in Air revenue growth in Asia and Europe in the quarter, as well as significant air market share gains in the latter region.** Beyond Air revenue growth accelerated to 22%, largely due to eNett as the business continued to expand share of wallet at several large OTAs in Asia Pacific and Europe.

- 10 -

> We continue to invest in innovation to drive growth.  In the quarter, this investment supported several new business wins, building on the record level of new business that we signed and onboarded in 2017 and, moreover, enabling us to achieve a significant long-term renewal of our partnership with Priceline.com. Our start to the year, therefore, gives us the confidence to reiterate our financial guidance for full year 2018.

Emphasis added.

35.    On August 2, 2018, Travelport reported its second quarter of 2018 financial results.  Net revenue grew to $662 million, compared to $612 million in the second quarter of 2017.  The press release quoted defendant Wilson as stating:

> Travelport has delivered a good quarter, with Travel Commerce Platform revenue up 9% and Adjusted EBITDA up 7%. Our strong performance enabled us to overcome the well-documented loss of a Pacific-based travel agency through winning new business in other regions. In fact, revenue growth accelerated across all regions in the quarter, with air market share growth in Asia, Europe and Latin America. Air revenue was up 5%, and Beyond Air revenue grew 21%, as the latter benefitted from another excellent quarter from our payments business, eNett.

Defendant Wilson further stated, "we remain well positioned for long-term growth as we continue to invest in our key areas of differentiation, including search, merchandising and shopping, mobile enablement, payments and our industry-leading hybrid cloud architecture."

36.    On November 1, 2018, Travelport issued a press release announcing its third quarter of 2018 financial results, including net revenue of $623 million and net

income of $6 million, an increase of 2% and 25%, respectively, over the third quarter

of 2017.  Defendant Wilson commented on the successful quarter, stating:

> We delivered net revenue and Adjusted EBITDA growth of 2% each in
> the quarter. The continued strong performance of Beyond Air, driven
> by our virtual payments business eNett, helped us overcome the more
> challenging market and customer environment we anticipated for the
> second half of the year.
>
> In the quarter, we continued to build the business in line with our
> strategy. Our Travel Commerce Platform delivered further business
> successes, especially in the regional corporate and online sectors where
> we are clearly benefiting from the investments we are making in the
> quality of our content and the capabilities and efficiency of our
> technology. We also strengthened our value proposition by concluding
> long-term deals to distribute the content of Air India and Jet Airways,
> in both cases as the preferred distributor. These add to our exclusive
> distribution contract with IndiGo and give us significant additional
> advantage in India and key markets beyond it. Furthermore, Travelport
> made history by becoming the first GDS to transact the booking of
> flights using IATA's New Distribution Capability (NDC) API protocol.
> These initiatives will contribute to the onboarding of new business next
> year, alongside the continued growth of eNett.

The press release further quoted defendant Wilson as stating, "[w]e remain well

positioned for longer term profitable growth given our commercial wins and the

ongoing investments we're making in the key areas that differentiate us, including

our industry-leading travel content; our search, merchandising and shopping

capabilities; and our leading mobile, data and payments solutions."

**The Sale Process**

      37.    On December 7, 2017, the Company's management recommended to

the Board to explore a possible sale involving eNett. This recommendation was put forward after the evaluation of various alternatives for eNett, including the continuation of eNett as a subsidiary of the Company, a stand-alone sale of eNett, a sale of eNett in combination with a sale of eNett's minority shareholder's business, and an initial public offering of eNett's shares.

38.    From January 2018 through March 2018, the Company's management engaged informally with both Morgan Stanley and another financial advisor to evaluate a potential sale of eNett, considering, among other things, the potential value of eNett, potential interested acquirers and potential divestment structures.

39.    On February 26, 2018, representatives of a financial sponsor, referred to in the Proxy Statement as "Sponsor Party A," spoke to defendant Wilson and expressed an interest in meeting to explore strategic alternatives for the Company. On March 14, 2018, Sponsor Party A's representatives conveyed through Morgan Stanley that Sponsor Party A's primary interest was in eNett and not an acquisition of the Company as a whole.

40.    On March 26, 2018, Elliott filed a statement on Schedule 13D announcing that it had acquired an 11.8% economic position in the Company, consisting of beneficial ownership interest of 6.5% of Travelport's then-outstanding common shares. In its Schedule 13D, Elliott stated that its investment rationale

included encouraging the Company to explore a potential sale of the Company.

41.    At a March 29, 2018 Board meeting, the Board retained Morgan Stanley as its financial advisor to assist with the Company's response to Elliott's Schedule 13D and to advise on exploring potential eNett monetization options.

42.    During the last week of March 2018, Morgan Stanley received several calls from parties interested in learning more about the situation involving the Company and Elliott.  From the time of its retention by the Board through the announcement of the Proposed Transaction on December 10, 2018, Morgan Stanley reported all such inbound inquiries that it received and all outbound inquiries that it made to a representative of the Company.

43.    On April 3, 2018, defendant Wilson informed eNett's minority shareholder that the Company was rejecting the terms it had proposed for a transaction involving eNett because the terms did not appropriately reflect the value of eNett.

44.    On April 6, 2018, Elliott met with defendants Steenland and Wilson and Bernard Bot ("Bot"), Travelport's Chief Financial Officer ("CFO"), to inform the Company it was initiating a strategic review process and that financial parties, including Elliott, would be willing to explore an acquisition of the Company.

45.    On April 8, 2018, Elliot confirmed it was working with a financial

sponsor referred to in the Proxy Statement as "Sponsor Party C" on a potential transaction involving taking Travelport private.

46.    At an April 16, 2018 Board meeting, the Company's management presented to the Board three sets of five-year financial projections assuming three different market and Company scenarios, and Morgan Stanley reviewed a preliminary standalone valuation analysis based on those projections.

47.    On April 23, 2018, Elliott and Sponsor Party C provided Morgan Stanley with a preliminary offer to acquire the Company in a range of $17.50 to $18.50 per share.

48.    Over the next few days, defendant Wilson spoke with three additional parties regarding their interest in potential transactions with Travelport.

49.    On April 26, 2018, eNett's CEO received an expression of interest for an acquisition involving eNett from a third party referred to in the Proxy Statement as "eNett Counterparty A."

50.    During a May 2, 2018 Board meeting, the Board discussed, among other things, the indications of interest from Elliott and Sponsor Party C and eNett Counterparty A, and the minimum acceptable terms of a potential sale involving eNett, including the minimum level of proceeds to be realized in a potential sale involving eNett.

51.     On May 4, 2018, Elliot and Sponsor Party C sent a revised indication of interest for $19.00 per share.

52.     Throughout May 2018, Travelport held discussions with Elliot and Sponsor Party C, a third party interested in a transaction involving eNett, referred to in the Proxy Statement as "eNett Counterparty B," and a potential strategic bidder interested in potential strategic alternatives with Travelport referred to in the Proxy Statement as "Strategic Party C."

53.     Following a May 24, 2018 discussion between defendant Wilson and a representative of eNett's minority shareholder, a potential sale involving eNett to eNett Counterparty A was not pursued further.

54.     On May 29, 2018, the Board met and reviewed developments with respect to Elliot and Sponsor Party C's indication of interest and Company management presented updated financial projections for two of the three previously presented scenarios, revised for the latest 2018 forecast and other business developments.

55.     The next day, Elliott informed Morgan Stanley that Sponsor Party C did not intend to proceed further with its evaluation of a potential transaction with the Company.

56.     On June 6, 2018, Elliott informed Morgan Stanley that it would partner

with a party referred to in the Proxy Statement as "Sponsor Party B." Sponsor Party B indicated to Morgan Stanley that its preliminary valuation views of the Company were in the range of $18 to $20 per share.

57.    Throughout June and early July 2018, the Company held discussions with Strategic Party C and Elliott and Sponsor Party B.

58.    On July 17, 2018, Elliott and Sponsor Party B conveyed to Morgan Stanley an indication of interest to acquire the Company for $18.00 per share.

59.    At a July 19, 2018 Board meeting, the Company's management presented updated financial projections for one of the three scenarios not updated for the May 29, 2018 Board meeting.

60.    On August 16, 2018, Elliott informed Morgan Stanley that Sponsor Party B did not intend to proceed further with a transaction.

61.    On August 21, 2018, on a call with defendant Wilson, representatives of Elliot expressed continued interest in buying the Company, but at a price that would be meaningfully below the previously expressed indication of $18.00 per share. Representatives of Elliott also expressed interest in possibly partnering with the Company to help finance an acquisition by the Company of the business of eNett's minority shareholder.

62.    At a September 5, 2018 Board meeting, the Board, members of

Company management, Morgan Stanley and the Company's legal counsel discussed recent developments related to the potential sale of the Company and reviewed updated financial projections for two of the scenarios previously presented.

63.    On September 19, 2018, the Company's management received an updated improved expression of interest from eNett Counterparty A with respect to a transaction involving eNett, with an offer deadline of 14 days, which was subsequently extended to October 18, 2018.

64.    On September 28, 2018, Siris expressed to Morgan Stanley its desire to potentially partner with Elliott.

65.    On October 11, 2018, the Board met and discussed, among other things, the minimum level of proceeds to be realized in a transaction involving eNett in order for such a transaction to be attractive to the Company.  The Company's management presented updated financial projections that included, among others, the impact of travel provider contracts recently concluded and expected travel agency wins.  These financial projections included those referred to in the Proxy Statement as the "Case C" financial projections for the Company, subsequently shared with Elliott and Siris.

66.    On October 18, 2018, representatives of the Company called representatives of eNett's minority shareholder to convey that the Company would

be open to pursuing a sale involving eNett, subject to the Company receiving a specified minimum level of proceeds. That same day, the preliminary expression of interest from eNett Counterparty A expired. The next day, eNett's minority shareholder rejected Travelport's proposal.

67.    On October 29, 2018, Morgan Stanley provided the go-shop term sheet to Siris.

68.    The next day, Elliott and Siris submitted an indication of interest to acquire the Company for $16.00 per share. They also indicated that they would not agree to all of the terms reflected on the go-shop term sheet provided the previous day, and that they would not proceed with further work unless they received a period of five weeks of exclusivity.

69.    On October 31, 2018, the Board met and reviewed Elliott and Siris' indication of interest and updated preliminary valuation analyses based on the most recent updated management financial projections.

70.    On November 5, 2018, Elliott and Siris agreed to increase their preliminary indication of interest to $16.25 per share in exchange for a two-week exclusivity period, which would be extended to December 3, 2018 if Elliott and Siris reaffirmed at the expiration of the two week period their indication of interest in a transaction at $16.25 per share and their agreement to a 45-day go-shop period

following any transaction announcement.

71.    From November 5 to November 18, 2018, Company management held numerous calls and meetings with Elliott and Siris as part of their due diligence process.

72.    On November 19, 2018, Elliott and Siris reaffirmed their $16.25 per share indication of interest and willingness to agree to a 45-day go-shop period, and, as a result, the exclusivity period was extended until December 3, 2018.

73.    On November 19 and 20, 2018, the Company's management presented to Elliott and Siris the 2018 and 2019 Forecasts, reflecting revised figures to those contained in Case C as presented to Elliott and Siris on October 23, 2018, including with respect to net revenue and commissions for these two years, resulting in lower net revenue minus commissions for fiscal year 2019, largely offset by new cost savings initiatives.  The 2018 and 2019 Forecasts were separate from, and did not constitute an update to, Case C.

74.    Over the next few weeks, the parties and their advisors negotiated the terms of the transaction and Merger Agreement.

75.    On December 3, 2018, Elliott and Siris conveyed to Morgan Stanley a reduced offer price of $15.25 per share.

76.    On December 5 and 6, 2018, the Board met and discussed various

valuation perspectives, including a review of two sets of updated financial projections prepared by Company management, referred to in the Proxy Statement as "Case A" and "Case B."

77. On December 8, 2018, Travelport, Elliott and Siris agreed to an offer price of $15.75 per share.

78. At a December 9, 2018 Board meeting, Morgan Stanley provided updates to its valuation work and addressed valuation related questions that had been raised by the Board during the December 5 and 6 Board meetings. Morgan Stanley then rendered its fairness opinion and the Board approved the Merger Agreement.

79. On December 10, 2018, the parties announced execution of the Merger Agreement and the go-shop period commenced. Morgan Stanley contacted 20 strategic parties and 13 financial sponsors in connection with the go-shop process. Three of these parties entered into confidentiality agreements with the Company and were granted access to the Company's electronic data room. The go-shop period expired on January 24, 2019.

**The Proposed Transaction**

80. On December 10, 2018, Travelport issued a press release announcing the Proposed Transaction, which states, in relevant part:

Langley, U.K., Dec. 10, 2018 /PRNewswire/ -- Travelport Worldwide Limited ("Travelport") (NYSE: TVPT), a leading travel technology

company, today announced that it has entered into a definitive agreement to be acquired by affiliates of Siris Capital Group, LLC ("Siris") and Evergreen Coast Capital Corp. ("Evergreen") in an all-cash transaction valued at approximately $4.4 billion. Evergreen is the private equity affiliate of Elliott Management Corporation ("Elliott").

Under the terms of the agreement, Siris and Evergreen will acquire all the outstanding common shares of Travelport for $15.75 per share in cash. The Board of Directors of Travelport unanimously approved the agreement and recommended that shareholders vote in favor of the transaction. Elliott and its affiliates have agreed to vote the common shares owned by them in favor of the transaction.

Doug Steenland, Chairman of the Board of Directors of Travelport, said: "This is a good outcome for Travelport's shareholders. Assisted by external advisers, the Board concluded unanimously, after taking into account the ongoing development needs of the business, that entering into this agreement represents the best way to maximize value for shareholders. It also enables the company to continue its work to position itself for growth in the evolving global travel industry."

Gordon Wilson, President and CEO of Travelport, commented: "Travelport welcomes this proposed transaction with Siris and Evergreen, who are specialist technology platform investors. Throughout the process, Siris and Evergreen have demonstrated their deep technology expertise together with a strong commitment to the success of our customers, employees and partners. We will continue to develop and invest in our platform to serve the changing needs of our customers in the travel industry. It is very much business as usual at Travelport and we look forward to this new era in the company's development."

Commenting on the transaction, John Swainson, an Executive Partner of Siris, said: "We have been impressed with Travelport's industry leadership, global scale and reach, local expertise, world-class management team and commitment to delivering best-in-class solutions for global travel suppliers and agencies. Siris looks forward to building on this legacy and supporting Travelport as it invests in its

platform and embarks on a new phase of innovation and industry leadership."

Frank Baker, Co-Founder of Siris Capital, added: "Travelport has an impressive track record of developing and bringing to market best-in-class distribution capabilities, technology services, innovative payment solutions and other value-add digital tools for the global travel industry. We have been impressed by the company's industry-leading GDS technology platform, which supports mission-critical transactions for both travel providers and agents. At the same time, Travelport is redefining the travel payments industry through eNett, a disruptive and fast-growing leader in secure, virtual travel payments. Siris looks forward to partnering with the company's management team and Evergreen in this next phase of Travelport's evolution and growth as a private company."

Jesse Cohn, Partner at Elliott, commented: "Under Gordon's leadership, Travelport has built a leading travel technology platform and a leading B2B payments offering in eNett. We look forward to investing in the Travelport team and working with them and Siris to build upon and advance Travelport's strong track record of technology innovation in serving global travel suppliers and agencies."

## Insiders' Interests in the Proposed Transaction

81.    Travelport insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of Travelport.

82.    Notably, certain of the Company's executive officers have potentially secured positions for themselves upon consummation of the Proposed Transaction.

Travelport's December 10, 2018 press release announcing the Proposed Transaction quoted Siris Co-Founder Frank Baker ("Baker") as stating, "Siris looks forward to partnering with the company's management team and Evergreen in this next phase of Travelport's evolution and growth as a private company."  Similarly, Jesse Cohn ("Cohn"), Partner at Elliott, was quoted as stating, "[w]e look forward to investing in the Travelport team and working with them and Siris to build upon and advance Travelport's strong track record of technology innovation in serving global travel suppliers and agencies."

83.    Moreover, Travelport's directors and executive officers stand to reap substantial financial benefits for securing the deal with Siris and Elliott.  For example, in addition to the millions of dollars the Individual Defendants and Company management will receive from the sale of their shares, pursuant to the Merger Agreement, Travelport's non-employee directors, executive officers, and other participants in certain Company equity plans will benefit from the accelerated vesting of all restricted stock units ("RSUs"), performance stock units ("PSUs") and Company options — an opportunity that would not otherwise be available.  The following table sets forth the expected value of each of the Company's non-employee directors' and executive officers' Company RSUs, PSUs and options assuming that the Proposed Transaction was completed on February 8, 2019:

| Name | Unvested Company Options (#) | Unvested Company Options ($)(1) | Vested Company Options (#) | Vested Company Options ($)(1) | Company RSUs (#)(2) | Company RSUs ($)(3) | Company PSUs (#)(4) | Company PSUs ($)(5) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| **Named Executive Officers** | | | | | | | | | |
| Gordon A. Wilson | 127,487 | 321,267 | 127,488 | 321,270 | 182,849 | 2,964,492 | 764,759 | 12,456,953 | 16,063,982 |
| Bernard Bot | — | — | — | — | 60,756 | 985,325 | 289,687 | 4,735,875 | 5,721,200 |
| Stephen Shurrock | 21,667 | 61,751 | 65,003 | 185,259 | 52,984 | 858,273 | 260,344 | 4,254,370 | 5,359,653 |
| Matthew Minetola | 43,156 | 109,842 | 50,390 | 128,651 | 46,955 | 760,091 | 190,663 | 3,101,075 | 4,099,659 |
| Margaret K. Cassidy | 9,328 | 23,507 | 9,329 | 23,509 | 25,268 | 407,809 | 96,061 | 1,556,019 | 2,010,844 |
| **Directors** | | | | | | | | | |
| Douglas M. Steenland | | | | | 65,156 | 1,028,881 | | | 1,028,881 |
| Elizabeth L. Buse | | | | | 25,060 | 395,724 | | | 395,724 |
| Steven R. Chambers | | | | | 25,060 | 395,724 | | | 395,724 |
| Michael Durham | | | | | 6,857 | 109,026 | | | 109,026 |
| Scott E. Forbes | | | | | 6,857 | 109,026 | | | 109,026 |
| Douglas Hacker | | | | | 25,060 | 395,724 | | | 395,724 |
| John B. Smith | | | | | 6,857 | 109,026 | | | 109,026 |

84.    In addition, if they are terminated in connection with the merger, defendant Wilson and certain members of Company management stand to receive millions in golden parachute compensation, as set forth in the following table:

| Name | Cash ($)(1) | Equity ($)(2) | Pension/NQDC ($)(3) | Perquisites/ Benefits ($)(4) | Total ($) |
|---|---|---|---|---|---|
| Gordon A. Wilson | 3,728,345 | 16,063,982 | — | — | 19,792,327 |
| Bernard Bot | — | 5,721,200 | — | — | 5,721,200 |
| Stephen Shurrock | — | 5,359,653 | — | — | 5,359,653 |
| Matthew Minetola | 453,006 | 4,099,659 | 44,271 | 18,000 | 4,614,936 |
| Margaret K. Cassidy | 395,145 | 2,010,844 | 36,077 | 20,972 | 2,463,038 |

## The Proxy Statement Contains Material Misstatements or Omissions

85.    The defendants filed a materially incomplete and misleading Proxy Statement with the SEC and disseminated it to Travelport's stockholders.  The Proxy Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote in favor of

the Proposed Transaction or seek to exercise their appraisal rights.

86.    Specifically, as set forth below, the Proxy Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) the Company's financial projections relied upon by the Company's financial advisor Morgan Stanley in its financial analyses; (ii) the valuation analyses prepared by Morgan Stanley in connection with the rendering of its fairness opinion; (iii) Morgan Stanley's and Travelport insiders' potential conflicts of interest; and (iv) the background process leading to the Proposed Transaction.  Accordingly, Travelport stockholders are being asked to vote for the Proposed Transaction or exercise their appraisal rights without all material information at their disposal.

***Material Omissions Concerning Travelport's Financial Projections***

87.    The Proxy Statement is materially deficient because it fails to disclose material information relating to the Company's intrinsic value and prospects going forward.

88.    Specifically, in connection with Morgan Stanley's *Discounted Cash Flow ("DCF") Analysis* of the Company, the Proxy Statement sets forth that "Morgan Stanley performed this analysis deriving estimated future cash flows from information contained in Case A and Case B. Morgan Stanley first calculated the

Unlevered Free Cash Flow (please see the section of this proxy statement captioned "—Management Projections" for more information on the calculation of Unlevered Free Cash Flow)." Proxy Statement at 46. The Proxy Statement further sets forth:

> Unlevered Free Cash Flow is defined as Free Cash Flow excluding interest and tax payments, less equity-based compensation (and related taxes) and taxes on income excluding amortization of acquired intangible assets and interest expense, in each case based on the information provided by the Company's management, and was derived by Morgan Stanley from the financial projections prepared by the Company based on the information provided by the Company and, with the Company's approval, was used for purposes of the valuation work in connection with the delivery of Morgan Stanley's fairness opinion as described in the section of this proxy statement captioned "—Fairness Opinion of Morgan Stanley & Co. LLC.

*Id.* at 52. The Proxy Statement fails, however, to disclose the line items Morgan Stanley utilized to calculate unlevered free cash flows for both Case A and Case B, including: (a) interest and tax payments, (b) equity-based compensation (and related taxes), and (c) taxes on income excluding amortization of acquired intangible assets and interest expense.

89.    Moreover, in its DCF analysis, Morgan Stanley "calculated terminal values by applying a perpetual growth rate of 0.25% to 0.75%, based on Morgan Stanley's professional judgment, to the normalized Unlevered Free Cash Flow of the Company for fiscal year 2022." *Id.* at 46. Yet, the Proxy Statement fails to disclose normalized unlevered free cash flow of the Company for fiscal year 2022, utilized

by Morgan Stanley in its DCF analysis.

90.    The omission of this information renders the statements in the "Management Projections" and "Fairness Opinion of Morgan Stanley & Co. LLC" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Morgan Stanley's Financial Analyses***

91.    The Proxy Statement describes Morgan Stanley's fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of Morgan Stanley's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, Travelport's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Morgan Stanley's fairness opinion in determining whether to vote in favor of the Proposed Transaction or seek to exercise their appraisal rights.  This omitted information, if disclosed, would significantly alter the total mix of information available to Travelport's stockholders.

92.    With respect to Morgan Stanley's *DCF Analysis*, the Proxy Statement fails to disclose: (i) the normalized unlevered free cash flow figure of the Company for fiscal year 2022; (ii) quantification of the inputs and assumptions underlying the

discount rate range of 6.4% to 6.8%; (iii) the basis for applying perpetual growth rates of 0.25% to 0.75%; and (iv) the implied terminal multiples resulting from the analysis.

93.    With respect to Morgan Stanley's *Precedent Transactions Analysis*, the Proxy Statement fails to disclose Morgan Stanley's basis for analyzing transactions announced over ten years ago.

94.    With respect to Morgan Stanley's *Discounted Equity Value Analysis*, the Proxy Statement fails to disclose: (i) the basis for utilizing a next twelve months P/E ratio range of 9.5x to 11.5x; and (ii) quantification of the inputs and assumptions underlying the discount rate of 8.8% to 9.7%.

95.    When a banker's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

96.    The omission of this information renders the statements in the "Fairness Opinion of Morgan Stanley & Co. LLC" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Morgan Stanley's and Travelport Insiders' Potential Conflicts of Interest***

97.    The Proxy Statement fails to disclose material information concerning

potential conflicts of interest faced by the Company's financial advisor, Morgan Stanley.

98.    The Proxy Statement sets forth:

Under the terms of its engagement letter, Morgan Stanley provided the Board of Directors with financial advisory services and a fairness opinion, described in this section and attached as Annex B to this proxy statement, in connection with the Merger, and the Company has agreed to pay Morgan Stanley for its services a fee that is expected to be approximately $19 million, substantially all of which is contingent upon the closing of the Merger.

Proxy Statement at 51.  The Proxy Statement fails, however, to quantify the portion of the fee that is contingent upon consummation of the Proposed Transaction.

99.    Further, the Proxy Statement sets forth:

In the two years prior to the date of its opinion, Morgan Stanley and its affiliates have received aggregate fees of between $1 million and $5 million in connection with financing services provided to the Company. In the two years prior to the date of its opinion, Morgan Stanley and its affiliates have received aggregate fees of between $1 million and $5 million in connection with financing services provided to the Elliott Funds and its affiliates. In the two years prior to the date of its opinion, Morgan Stanley and its affiliates have received aggregate fees of between $25 million and $50 million in connection with financial advisory and financing services provided to Siris and its affiliates. ***In addition, Morgan Stanley or an affiliate thereof is currently a lender to the Company and certain affiliates of Siris.*** Morgan Stanley may also seek to provide such services to Siris, the Elliott Funds and the Company and their respective affiliates in the future and would expect to receive fees for the rendering of these services.

*Id.* Emphasis added. Yet, the Proxy Statement fails to disclose the amount of compensation Morgan Stanley expects to receive in connection with serving as a lender to the Company and certain affiliates of Siris.

100. Full disclosure of all potential conflicts concerning investment bankers is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

101. Further, the Proxy Statement fails to disclose material information concerning the potential conflicts of interest faced by Travelport insiders.

102. In the December 10, 2018 press release announcing the Proposed Transaction, Baker, Co-Founder of Siris Capital, is quoted as stating, "Siris looks forward to partnering with the company's management team and Evergreen in this next phase of Travelport's evolution and growth as a private company." Cohn, Partner at Elliott, is also quoted as stating, "[w]e look forward to investing in the Travelport team and working with them and Siris to build upon and advance Travelport's strong track record of technology innovation in serving global travel suppliers and agencies."

103. The Proxy Statement, however, fails to set forth all of the discussions and negotiations concerning future employment, purchase of or participation in the equity of the surviving corporation, that occurred between Siris and Elliott and

Travelport's executive officers.  The Proxy Statement further fails to disclose whether any of Siris' and Elliott's proposals or indications of interest mentioned management retention or the potential for Travelport executive officers to purchase or participate in the equity of the surviving corporation.

104.   Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders.  This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

105.   The omission of this information renders the statements in the "Background of the Merger" and "Interests of Travelport's Directors and Executive Officers in the Merger" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning the Background of the Proposed Transaction***

106.   The Proxy Statement is materially deficient because it fails to disclose material information relating to the background of the sale process.

107.   The Proxy Statement fails to disclose the identity of the representative of the Company to whom Morgan Stanley reported all inbound and outbound

inquiries, from the time of Morgan Stanley's retention by the Board through the announcement of the Proposed Transaction.

108.   The Proxy Statement fails to disclose the terms of all proposals or indications of interest Travelport received in connection with the potential sale of eNett, including the proposal the Company rejected on April 3, 2018, and the updated expression of interest from eNett Counterparty A the Company received on September 19, 2018.

109.   The Proxy Statement fails to disclose the alternatives to maximize value for the Company and its stockholders discussed at the April 16, 2018 Board meeting and the strategic alternatives discussed at the May 2, 2018 Board meeting.

110.   The Proxy Statement fails to disclose the minimum acceptable terms of a potential sale involving eNett as well as the minimum level of proceeds to be realized in a potential sale involving eNett discussed at the May 2 and October 11, 2018 Board meetings.

111.   The Proxy Statement fails to disclose the terms of the go-shop term sheet Morgan Stanley provided to Siris on October 29, 2018.

112.   The Proxy Statement fails to disclose the "valuation related questions that had been raised by the Board" during Board meetings on December 5 and December 6, 2018.  Proxy Statement at 38.

113.   The omission of this information renders the statements in the "Background of the Merger" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

114.   The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy Statement.   Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to vote in favor of the Proposed Transaction or exercise their appraisal rights and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

### COUNT I

**Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

115.   Plaintiff repeats all previous allegations as if set forth in full.

116.   During the relevant period, defendants disseminated the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and

SEC Rule 14a-9 promulgated thereunder.

117.   By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy Statement.  The Proxy Statement was prepared, reviewed, and/or disseminated by the defendants.  It misrepresented and/or omitted material facts, including material information about the actual intrinsic standalone value of the Company, the financial analyses performed by the Company's financial advisor, potential conflicts of interest faced by the Company's financial advisor and Company insiders, and the background process leading to the Proposed Transaction.  The defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

118.   The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction or whether to seek to exercise their appraisal rights.

119.   By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

120.   Because of the false and misleading statements in the Proxy Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money

damages inadequate.    Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

121.    Plaintiff repeats all previous allegations as if set forth in full.

122.    The Individual Defendants acted as controlling persons of Travelport within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Travelport, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

123.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

124.    In particular, each of the Individual Defendants had direct and

supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of the Proxy Statement.

125. In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions the Company directors had input into.

126. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

127. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' conduct, Travelport's stockholders will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of Travelport, and against defendants, as follows:

A.    Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.    Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until defendants disclose and disseminate the material information identified above to Travelport stockholders;

C.    In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.    Declaring that defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as SEC Rule 14a-9 promulgated thereunder;

E.    Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


Dated: February 25, 2019                    **WEISSLAW LLP**

/s/ *Michael A. Rogovin*
Michael A. Rogovin
Georgia Bar No. 780075
476 Hardendorf Ave. NE
Atlanta, GA 30307
Tel.: (212) 682-3025
Fax: (212) 682-3010
mrogovin@weisslawllp.com
                -and-
Richard A. Acocelli
1500 Broadway, 16th Floor
New York, NY 10036
Telephone: 212/682-3025
Facsimile: 212/682-3010

*Attorneys for Plaintiff*